# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00371-CR

**Terry Michael Crum, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
### NO. 005450, HONORABLE FRED A. MOORE, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Terry Michael Crum guilty of two counts of aggravated sexual assault of a child and one count of indecency with a child by contact. Tex. Pen. Code Ann. §§ 21.11, 22.021 (West 2003). The district court assessed sixty-year prison terms for the sexual assaults, and a twenty-year prison term for the indecency. In his only point of error, Crum urges that the evidence is factually insufficient to sustain the jury's verdict of guilt. We will overrule this contention and affirm the conviction.

A factual sufficiency review asks whether a neutral review of all the evidence, both for and against the finding of guilt, demonstrates that the proof of guilt is either so obviously weak or so greatly outweighed by contrary proof as to undermine confidence in the jury's determination. *See Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). Due deference must be accorded the

fact finder's determinations, particularly those concerning the weight and credibility of the evidence, and the reviewing court may disagree with the fact finder only when the record clearly indicates that such a step is necessary to prevent a manifest injustice. *Id*. at 9. A verdict may be set aside only if a finding of guilt beyond a reasonable doubt is clearly wrong and unjust. *See Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); *Stone v. State*, 823 S.W.2d 375, 381 (Tex. App.—Austin 1992, pet. ref'd, untimely filed).

The complaining witness, who was eighteen years old at the time of trial in May 2002, testified that her mother and father separated during the summer following her sixth grade year. The cause of the separation was, at least in part, her mother's relationship with Crum. Crum, who was divorcing his own wife, came to live with the complainant and her mother after the complainant's father moved out of the house.

One night the complainant left her bedroom to get a glass of water. She saw Crum and her mother on the living room floor engaged in sexual intercourse. Her mother was blindfolded. The complainant returned to her bedroom, thinking she had been unseen. Later that night, however, she was awakened by Crum kissing her and touching her breasts and genitals. When she protested, Crum told her to "shut up" and "do it." Crum removed the complainant's clothing and instructed her to lie on top of him in the "sixty-nine" position. He placed his mouth on her genitals and penetrated her with his tongue while putting his penis in her mouth. This activity ended when Crum ejaculated. Thereafter, Crum often had the complainant "do the sixty-nine" or masturbate him when her mother was out of the house.

2

Crum sometimes had the complainant hide behind a couch in the living room and watch him have intercourse with her mother, who was always blindfolded. Crum had two dildos which he would insert in her mother's vagina or mouth. Crum also tried to use the dildos with the complainant, but she refused to allow it. One day when her mother was out shopping, Crum sat beside the complainant on the couch, began to touch her, and eventually attempted to penetrate her vagina with his penis. She felt a sharp pain and asked him to stop, which he did. He then got a "sweeper broom" and attempted to penetrate her with the handle. This also hurt and he stopped when she cried out.

The complainant testified that Crum had a yellow and white spray can with what she described as a straw coming out of the nozzle. He once sprayed the contents of the can into her mouth. It tasted odd, and made her feel sleepy.

The complainant told her mother "that things were happening that weren't supposed to with Michael, that he was touching me." Her mother "just kind of looked at me weird" and "just chuckled and . . . said that, you know, that I shouldn't say anything like that." Crum had warned the complainant that he would hurt her or her mother if she revealed what was happening, and she made no other outcry at that time.

The complainant's mother suffered from epilepsy and took drugs to control her seizures. Her seizures became worse after the complainant's father left. She would often forget to take her medicine, and Crum "would give her too much or not enough, and then she had more seizures on the floor." The complainant would sometimes come home from school to find her mother wandering about the house naked or in her underwear. Finally, the complainant called her

3

father and reported her mother's condition. Her father came to the house and took her mother to a doctor. He also went to the police to report what he believed might be criminal mistreatment of his wife by Crum. Although the complainant also spoke to the police, she did not report Crum's sexual misconduct with her at this time.

The complainant's father ordered Crum out of the house and moved back in with the complainant and her mother. He found two pornographic videotapes and two dildos in the house which he unsuccessfully tried to give to the police. He eventually hid them and gave them to the police after the complainant made her outcry several years later. The complainant identified the dildos at trial as the ones Crum used with her and her mother.

After returning to the home, the complainant's father noticed a change in the relationship between his wife and daughter. The complainant's behavior had also changed. She would not sleep in pajamas, but wore her clothes to bed. She also neglected her personal hygiene, leaving dirty underwear and used feminine hygiene products scattered about her bedroom and bathroom. By the time she was sixteen, the complainant's behavior was such that her parents decided to relinquish custody to Child Protective Services (CPS). Based on information received from her parents, CPS initially classified the complainant as a "level five" child, indicating that she was seriously disturbed. However, after she was placed in the Settlement Home, a residential facility, the complainant was quickly reclassified as "level four." The complainant did well in CPS care and was eventually reduced to a "level two," which meant she could be placed in a foster home. Although she briefly lived with a foster family, she chose to return to a group house to live. When she turned eighteen, the complainant voluntarily left CPS care while she completed high school.

While living in the Settlement Home, the complainant began having disturbing dreams that reminded her of Crum's sexual abuse. In June 2000, she told her house supervisor what Crum had done to her. This led to a police investigation culminating in Crum's arrest and prosecution. The complainant was examined by a physician, but due to the passage of time the examination was normal and neither corroborated nor contradicted the complainant's accusations against Crum.

In his own testimony, Crum acknowledged having a sexual relationship with the complainant's mother while he lived in their house. He denied engaging in any sexual conduct with the complainant.

Crum's argument in support of his claim that the evidence is factually insufficient is nothing more than an attack on the complainant's credibility. He points out that she had been diagnosed with "conduct disorder," attention deficit hyperactivity disorder, and fetal alcohol syndrome. He also points to the complainant's own admission that she had a reputation for dishonesty. Other evidence suggests, however, that the diagnoses cited by Crum were preliminary and based on information obtained from the complainant's parents. The diagnoses changed after the complainant was observed by CPS workers. Anna Warde, one of the CPS caseworkers, testified that the complainant was "a model child." Warde stated that the complainant was a "typical teenager" and "lied quite a bit" about things such as smoking cigarettes and leaving school, but she "didn't lie about the important stuff." Warde believed that "she was a very trustworthy child."

Crum cites testimony about the complainant's "atrocious hygiene habits" as evidence of her emotional disturbance. But Dr. William Carter, a psychologist, testified that such behavior

5

was common in sexually abused children. Carter also testified that a delayed outcry, another factor cited by Crum as discrediting the complainant's testimony, is common among abused children.

Crum complains that the complainant was uncertain as to the date of the alleged abuse. The indictment alleged that the crimes were committed on or about July 1 and September 1, 1994. The complainant testified that Crum moved to her house in July 1995. The complainant's father and Crum himself testified that he lived with the complainant's mother in July and August 1996. But while the complainant may have been mistaken as to the year, she was consistent in saying that the abuse took place during the time Crum was living with her mother, after her parents' separation.

Crum refers us to his testimony that he takes medication for a heart condition which reduces his ability to achieve and maintain an erection. He urges that the complainant's "allegations of near-constant sex with a middle-aged man on heart medication are bizarre and improbable." He points to the absence of physical evidence and to the State's failure to call the complainant's mother to testify. And he asks, "[H]ave you ever heard of the sort of 'spray' described by [the complainant]?"

It is commonly and accurately said that a trial jury is better able to judge the credibility of witnesses than is an appellate court having only a cold record to review. For this reason, an appellate court conducting a factual sufficiency review must give particular deference to a jury's determinations regarding the weight and credibility of the testimony. *Johnson*, 23 S.W.3d at 9. Having reviewed the record as a whole, and giving the jury's verdict the deference it is due, we conclude that the finding of guilt was not manifestly unjust.

6

We overrule Crum's factual sufficiency challenge and affirm the judgment of conviction.

_____

Bea Ann Smith, Justice

Before Chief Justice Law, Justices B. A. Smith and Puryear

Affirmed

Filed:   July 11, 2003

Do Not Publish